No. 24-471

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JESSIE SMITH,

Defendant-Appellant.

———

Appeal from the
United States District Court
for the Southern District of California
Honorable Dana M. Sabraw, Presiding
Dist. Ct. Case No. 3:14CR1287-DMS

———

APPELLANT'S OPENING BRIEF

_____

RYAN W. STITT

STITT VU TRIAL LAWYERS APC

Address: 185 W F St, Ste 100-K, San Diego, CA 92101

Phone: (619) 255-0553

Attorney for Defendant-Appellant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ III

INTRODUCTION ....................................................................................... 1

STATEMENT OF JURISDICTION ............................................................... 2

BAIL STATUS ........................................................................................... 3

STATUTORY PROVISIONS ......................................................................... 3

ISSUES FOR REVIEW ................................................................................ 3

STATEMENT OF THE CASE ....................................................................... 3

    A.    Mr. Smith's background. ............................................................ 3

    B.    Underlying offense, arrest, and sentencing. ............................. 5

    C.    United States Probation Office's Petitions for Revocation of Supervised Release. ...................................................................... 6

    D.    Litigation prior to the contested hearing. ................................ 8

    E.    Day one of the contested revocation hearing. ....................... 10

    F.    Day two of the revocation hearing and sentencing. .............. 16

SUMMARY OF ARGUMENT ...................................................................... 21

ARGUMENT ............................................................................................ 23

    A.    The district court erred by denying Mr. Smith's motion to compel the Government to disclose favorable evidence under *Brady v. Maryland*. ....... 23

        1.    Standard of Review ........................................................ 24

        2.    *Brady* should apply to revocation hearings as well as criminal trials. ....... 25

        3.    A *Brady* violation occurred in this case. ..................... 40

i

B.    The Government failed to provide Ms. Duncan's prior recorded statement calling the police in violation of Fed. R. Crim. P. 26.2 and her testimony should therefore be stricken. ....................................................... 49

1.   The standard of review is de novo. ........................................... 50

2.   Ms. Duncan's 911 call is a statement under Rule 26.2(f)(2) and it was in the custody and control of the Government. .................................... 50

3.   The Government's failure to produce the 911 call harmed Mr. Smith's defense because Ms. Duncan's testimony should have been stricken for the Government's non-compliance Fed. R. Crim. P. 26.2, Ms. Duncan's credibility was central to Mr. Smith's defense, and Ms. Duncan's hearsay statements would have been inadmissible without her testimony. ................. 55

CONCLUSION ................................................................................ 57

CERTIFICATE OF RELATED CASES ....................................................... 58

CERTIFICATE OF COMPLIANCE ........................................................... 59

## TABLE OF AUTHORITIES

**Cases**

*Ake v. Oklahoma*, 470 U.S. 68 (1985).................................................36, 40

*Bailey v. Rae*, 339 F.3d 1107 (9th Cir. 2003) ..................................42

*Benn v. Lambert*, 283 F.3d 1040 (9th Cir. 2022)..............................47

*Brady v. Maryland*, 373 U.S. 83 (1963) ..................................... passim

*Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997).............................44

*Comstock v. Humphries*, 786 F.3d 701 (9th Cir. 2015) ..................... passim

*District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52 (2009)

.................................................................................33, 34

*Gagnon v. Scarpelli*, 411 U.S. 778 (1973) .................................. passim

*Giglio v. United States*, 405 U.S. 150 (1972) ...............................32

*Horton v. Mayle*, 408 F.3d 570 (9th Cir. 2005) ........................ 45, 47, 48

*Kyles v. Whitley*, 514 U.S. 419 (1995) ..................................... passim

*Little v. Streater*, 452 U.S. 1  (1981) .......................................36

*Mathews v. Eldridge*, 424 U.S. 319 (1976)..................................37

*Milke v. Ryan*, 711 F.3d 998 (9th Cir. 2013)................................42

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ................................ passim

*Strickler v. Greene*, 527 U.S. 263 (1999).................................. passim

iii

*United States v. Agurs*, 427 U.S. 97 (1976)......................................................32, 48

*United States v. Bagley*, 473 U.S. 667 (1985).....................................................45, 48

*United States v. Bruce*, 984 F.3d 884 (9th Cir. 2021)..............................................42

*United States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989)............................................52

*United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019), rehearing and rehearing en

    banc denied, 973 F.3d 966 (9th Cir. 2020), certiorari denied, 141 S.Ct. 277

    (2021)..................................................................................................52

*United States v. Cedano-Arellano*, 332 F.3d 568 (9th Cir. 2003) ............................50

*United States v. Comito*, 177 F.3d 1166 (9th Cir. 1999).....................................55, 56

*United States v. Hall*, 419 F.3d 980 (9th Cir. 2005) ...............................................27

*United States v. Haymond*, 588 U.S. 634 (2019)...................................................30

*United States v. Lehman*, 792 F.2d 899 (9th Cir. 1986)..........................................24

*United States v. McKoy*, 78 F.3d 446 (9th Cir. 1996) ............................................55

*United States v. Price*, 566 F.3d 900 (9th Cir. 2009).........................................passim

*United States v. Ruiz*, 536 U.S. 622 (2002) .....................................................36, 40

**Statutes**

18 U.S.C. § 3231.....................................................................................2

18 U.S.C. § 3500....................................................................................50

21 U.S.C. §§ 841(a)(1) and 846 ..................................................................5

iv

28 U.S.C. § 1291 ................................................................. 2

28 U.S.C. § 1294(1) ........................................................... 2

Cal. Penal Code § 245(a)(1) ............................................. 6

Cal. Penal Code § 594(B)(2)(A) ....................................... 6

**Rules**

Federal Rule of Criminal Procedure 26.2 ....................................... passim

Federal Rule of Criminal Procedure 32.1 ......................................... 12, 29, 50, 56

INTRODUCTION

Mr. Smith was accused by his partner, Ms. Duncan, of two incidents of domestic violence. There were no eyewitnesses to the incidents, and Ms. Duncan contradicted herself and recanted her statement multiple times. A crucial piece of withheld evidence was the recording of a 911 call in which she stated that Mr. Smith "possibly" hit her.  Typically, the Government would be required to produce this type of *Brady* evidence for its exculpatory and impeachment value. But the State of California did not pursue a conviction against Mr. Smith. Rather, because he was on federal supervised release, the United States Probation Office filed a petition to revoke his supervision. Defendants facing revocation have fewer rights than those facing a new criminal conviction, thus Mr. Smith had no jury trial and instead a district court judge found him guilty by a preponderance of the evidence standard. But despite the different posture of the case, Mr. Smith was still entitled to due process protections.

The district court committed two legal errors. First, this Court should hold as a matter of first impression that a defendant has a right to *Brady v. Maryland* evidence in a supervised release proceeding when the alleged violation conduct is new criminal conduct with no underlying conviction. It should further find that the suppression of this *Brady* evidence was prejudicial, as Ms. Duncan's credibility was

the key issue in the case. Second, the recorded 911 call was a recorded statement that was in the custody and control of the Government and not produced to Mr. Smith as required under Fed. R. Crim. P. 26.2. The district court incorrectly ruled that the 911 call was not in the custody and control of the Government because the San Diego Police Department ("SDPD") was the lead investigating agency, though the Government had presented substantial evidence and testimony obtained from the SDPD. Had the district court properly applied the standard for Rule 26.2, it would have excluded Ms. Duncan's testimony entirely, which would have greatly weakened the Government's case. Because of these two errors, this Court should reverse and remand to the district court.

## STATEMENT OF JURISDICTION

Jessie Smith appeals his judgment for violating the terms of his supervised release. ER-4. The district court had original jurisdiction over this criminal offense against the United States under 18 U.S.C. § 3231. This Court has jurisdiction over a timely appeal from a final order entered in the Southern District of California, within the Ninth Circuit's geographical jurisdiction. 28 U.S.C. §§ 1291 & 1294(1).

The district court entered the final judgment and commitment order on January 29, 2024. ER-4. Mr. Smith timely filed a Notice of Appeal the next day on January 30, 2024. ER-217; Fed. R. App. P. 4(b)(1)(A)(i).

## BAIL STATUS

Mr. Smith is currently in the custody of the Bureau of Prisons ("BOP"). His scheduled release date is July 23, 2025.

## STATUTORY PROVISIONS[1]

U.S. Constitution, Amdt. 5: "No person shall . . . be deprived of life, liberty, or property, without due process of law."

Federal Rules of Criminal Procedure 26.2 and 32.1.

## ISSUES FOR REVIEW

1.     Did the district court violate Mr. Smith's right under *Brady v. Maryland* to receive all materially exculpatory evidence in the Government's possession when he was charged with violating the terms of his supervised release with new and unproven criminal conduct?

2.     Did the district court violate Mr. Smith's rights under Federal Rule of Criminal Procedure 26.2 by failing to order production of Ms. Duncan's statement?

## STATEMENT OF THE CASE

**A.**    **Mr. Smith's background.**

Mr. Smith is 41 years old and he was born and raised in San Diego, California. Presentence Report (PSR) at 3. Mr. Smith's parents both struggled with

---

[1] The addendum to this brief contains the full text of these provisions.

drug addiction during his childhood, and as a result, Mr. Smith had an unstable youth in which he was "passed around" between multiple family members. PSR ¶ 59. In addition to being exposed to drug use from an early age, Mr. Smith also was surrounded by violence. *Id.* His mother was physically abusive towards both him and his father. *Id.* Mr. Smith recalls his mother hitting him and his siblings with sticks, as well as an incident where she cut his father with a knife so deep that it left scars. *Id.* Additionally, almost everyone in his immediate family was affiliated with a gang. *Id.* ¶ 64.

Even when living with other relatives, Mr. Smith felt unsafe, neglected, and unloved. *Id.* ¶ 59. His maternal aunts and uncles would bully him and the environment was "always negative or violent." *Id.* Tragically, when he was only 6 years old, Mr. Smith was the victim of sexual abuse by his maternal aunt. *Id.* Due to a lack of trust in any of the adults in his life to protect him, Mr. Smith never reported the abuse to anyone in his family and never received any psychological treatment for the trauma. *Id.*

Mr. Smith's maternal family has a history of mental health problems. *Id.* ¶ 67. At approximately age 8, Mr. Smith was diagnosed with Bipolar Disorder. *Id.* He was treated with a psychiatrist for this issue until the age of 16. *Id.* For a few years, he was placed on medication, but eventually he began using narcotics to "self-medicat[e]"

against the depression, auditory hallucinations, and "crazy thoughts" that he experiences. *Id.*

Mr. Smith never really felt any love in his life until he had his own first child. *Id.* ¶ 59. Mr. Smith now has three children: a 21-year-old daughter who lives on the East Coast; an 11-year-old daughter who lives in Southern California; and another 11-year-old daughter with his current partner Aviana Duncan. PSR ¶¶ 60–62.

**B.    Underlying offense, arrest, and sentencing.**

Mr. Smith was arrested on April 25, 2014. PSR at 3. A federal investigation starting in the spring of 2013 had revealed that Mr. Smith, along with additional co-conspirators, was involved in the trafficking of methamphetamine. *Id.* ¶ 4. According to the case agent, Mr. Smith had gotten involved with his family's gang, and had begun distributing drugs with his cousin. *Id.* ¶ 13. Mr. Smith was named in one count of the eight-count indictment, for Conspiracy to Distribute 50 Grams or More of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. ER-221.

On November 4, 2014, Mr. Smith was arraigned on and pleaded guilty to a superseding information charging him with one count of Conspiracy to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 841 and 846. ER-226. On

5

November 23, 2015, he was sentenced to 110 months in the custody of the BOP, to be followed by 5 years supervised release. ER-228.

## C.   United States Probation Office's Petitions for Revocation of Supervised Release.

Mr. Smith was released from prison on March 17, 2022. ER-213. On November 7, 2023, the United States Probation Office ("USPO") filed a Petition for Warrant or Summons for Offender Under Supervision, alleging that Mr. Smith had violated the conditions of his supervised release and seeking a no-bail bench warrant from the district court. ER-213. The petition was signed by the probation officer who had been directly responsible for his supervision, Talia Devine, and her supervisor, Craig Bilinski. ER-215. The district court issued the no-bail bench warrant and Mr. Smith was arrested on November 9, 2023. ER-232.

The petition contained two allegations that Mr. Smith was noncompliant because he had "commit[ted] another federal, state, or local crime." ER-214. Specifically, it alleged that Mr. Smith committed felony assault with a deadly weapon in violation of Cal. Penal Code § 245(a)(1) and misdemeanor vandalism in violation of Cal. Penal Code § 594(B)(2)(A). *Id.* These allegations were based on a report from the SDPD. *Id.* According to the SDPD, on November 7, 2023, Mr. Smith's partner Aviana Duncan reported to police that Mr. Smith had punched her in the face two

or three times, hit her with a mop stick approximately twice, and slashed her tires with a knife. *Id.* These incidents allegedly occurred at Mr. Smith's residence. *Id.*

On November 16, 2023, the USPO filed an Amended Request for Offender Under Supervision, petitioning the district court to add two new allegations to the original petition. ER-206. Those two new allegations also involved reports from SDPD that Mr. Smith had committed two new state offenses on November 9, 2023: another felony assault with a deadly weapon in violation of Cal. Penal Code § 245(a)(1) and a misdemeanor assault with a deadly weapon with force: possible bodily injury in violation of Cal. Penal Code § 245(a)(4). ER-207. According to the SDPD, two days after the original call from Ms. Duncan, the police responded to another domestic violence call at Mr. Smith's residence. *Id.* At that time, Ms. Duncan reported that Mr. Smith strangled her until she lost consciousness, hit her head with a metal lamp, and smashed her face into the hardwood floor. *Id.* Based on these four allegations in the two petitions, the USPO recommended that the district court revoke Mr. Smith's supervision and sentence him to the maximum term of 24 months custody, with an additional 5 years supervised release. ER-210.

No charges were filed by the San Diego District Attorney related to any of these alleged offenses by Mr. Smith. ER-203.

**D.    Litigation prior to the contested hearing.**

On November 21, 2023, defense counsel requested a hearing to contest the allegations from the two petitions. ER-233. That same date, the United States filed a Motion to Allow Release of Information, seeking the release of the police reports and supporting documentation to counsel for both parties; the district court granted that motion. *Id.* The contested hearing was set for December 14, 2023. *Id.*

On December 1, Mr. Smith filed a Motion to Compel Discovery. ER-203. That motion noted that defense counsel had requested the chronological notes of the Probation Officer, and USPO had refused to provide it. ER-204. The motion further argued that Mr. Smith was not simply entitled to "disclosure of information *supporting* the allegations," as the district court had ordered, but that Mr. Smith was "entitled to information in the probation officer's possession that would undercut the charges or otherwise assist in defending against the allegations." ER-204. The district court ordered the United States to file a response to that motion. ER-202. In its response, the Government stated that it was unaware of what information was in the USPO files and requested that the district court ask USPO to respond to the motion. ER-197.

On December 4, 2023, Probation Officer Talia Devine sent an *ex parte* email to chambers stating that the USPO objected to Mr. Smith's motion to compel

8

discovery. ER-196. It asserted that its chronological notes "could potentially expose the suspected victim in the case" and "contain sensitive intelligence information, and other potential victim names and information, which could potentially compromise any outstanding intelligence." *Id.* On December 7, 2023, the district court issued an order denying Mr. Smith's motion and including the email from the USPO. ER-193. The district court stated that USPO had demonstrated compelling reasons to prevent disclosure of the records and that Mr. Smith had "not demonstrated a likelihood of discovering mitigating evidence if allowed to proceed with discovery as requested." *Id.* The district court further reset the contested hearing for January 4, 2024. ER-234.

On December 18, 2024, Mr. Smith filed an ex parte and under seal application for Rule 17 subpoenas. ER-187. That application explained that through investigation, defense counsel had learned that Ms. Duncan retracted all of her allegations against Mr. Smith. ER-188. In fact, Ms. Duncan had spoken to both Probation Officer Craig Belinski and SDPD Detective Janine Van Antwerp to explain that Mr. Smith did not commit the alleged assaults and vandalism against her. *Id.* Mr. Smith thus sought subpoenas for both Officer Belinski and Detective Van Antwerp, as well as requested that the district court order that the USPO provide all of its chronological notes regarding Mr. Smith to the district court for in

9

camera review of what should be discoverable. ER-189–90. The district court issued the requested subpoenas.

## E.    Day one of the contested revocation hearing.

The first day of Mr. Smith's contested revocation hearing occurred on January 4, 2024. ER-9. Before any witnesses were called, Mr. Smith raised the issue of his right to disclosure of material exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). ER-13. Mr. Smith acknowledged that there was no Ninth Circuit case squarely addressing the issue of whether *Brady* applies to supervised release revocation hearings. ER-13–14. Mr. Smith then identified Ms. Duncan's exculpatory statements to Officer Belinski as one piece of *Brady* information that he should be entitled to receive. ER-15. The district court determined that it would, after testimony began, review the USPO file to determine whether there was "anything potentially exculpatory," and then make a decision regarding disclosure. ER-18. Mr. Smith objected, stating that he should receive any *Brady* evidence prior to the hearing so that he could effectively cross-examine witnesses. ER-19. The district court, however, noted that it had ruled that *Brady* did not apply in the context of a revocation hearing and it would proceed with its original plan. ER-19. Officer Talia Devine advised the district court that the USPO files for Mr. Smith consisted of 4

pages, with 3 chronological entries written by herself and her supervisor, Officer Belinski. ER-21.

The United States called its first witness, Officer Alyssa McConnell. ER-23. Because the SDPD arresting officer from the alleged incident on November 7, 2023, was not available, the Government proceeded first upon the two allegations from November 9, 2023. ER-12. The Government introduced body camera footage from Officer McConnell responding to Ms. Duncan on November 9, as well as photographs of Ms. Duncan's injuries and the home, including pictures of blood on the sheets, on a lamp, and on a door. ER-24–28. The body camera footage included several statements from Ms. Duncan implicating Mr. Smith; Mr. Smith objected to these as hearsay but was overruled. ER-31. Officer McConnell testified that Ms. Duncan told her that Mr. Smith was responsible for the injuries. ER-32–33. The officer further stated that, in the ambulance, Ms. Duncan exchanged text messages with Mr. Smith, which were photographed by the police. ER-30. Those photographs demonstrate that Ms. Duncan texted Mr. Smith, accusing him of trying to kill her and spending all her money on "Makayla." ER-152; ER-157. Mr. Smith responded stating that Ms. Duncan was "embarrassing" herself. ER-152; ER-157.

After direct examination of Officer McConnell, the district court took a short recess to review the USPO files. ER-32. After its review, it ordered Officer Devine to

turn over the files to both defense counsel and the Government. ER-33–34. Mr.

Smith then cross-examined Officer McConnell. ER-37. During cross-examination,

Officer McConnell testified that Ms. Duncan called "wanting to recant and change

her statement." ER-56. Officer McConnell also acknowledged that the blood on the

door was not splattered, but rather appeared to have been "smudged or kind of

moved around on the door" in a circular pattern. ER-40.

      Officer McConnell further testified she received a request from Ms. Duncan

to call her on November 9th or 10th. ER-55. Officer McConnell contacted Ms.

Duncan and Ms. Duncan "want[ed] to recant and change her statement. . ." ER-56.

Officer McConnell could not remember all of the details from the phone call, and

she testified that she referred Ms. Duncan to the assigned detective. ER-56. Officer

McConnell testified that she probably took notes from the call and that it would

further have been recorded by her body camera. *Id.*

      Mr. Smith moved under Fed. R. Crim. P. 26.2 for the recorded statement.

ER-56–57. The Government initially opposed Mr. Smith's motion and argued that

Rule 26.2 did not apply at a revocation hearing. ER-57. The Government later

agreed that upon review of Fed. R. Crim. P. 32.1, Rule 26.2 applied, so it agreed to

obtain the recorded statement. ER-104. The Court further required Officer

McConnell to appear at the next hearing date to allow her to be cross-examined after the statement was produced. ER-116.

Next, the Government called Ms. Duncan to testify. ER-60. On direct examination, she testified:

> This is what I am going to say, and this is what I told the District Attorney and this is what I told the SDPD and this is what I told his probation officer and the probation officer supervisor; the events that happened he did not do. And that's it. That's all I want to say.

ER-60–61. During cross-examination, Ms. Duncan testified that she had been upset with Mr. Smith because he had been cheating on her with a woman named Makayla. ER-62. She explained that Makayla had previously threatened and harassed her, including rubbing blood all over her car, leading her to successfully obtain a restraining order against Makayla. ER-62. Ms. Duncan also testified that she was "very, very intoxicated" on both November 7 and 9 of 2023—"the whole week, actually"—due to her brother's death. ER-63. She stated that in addition to drinking, she had also taken an excessive dosage of her prescription Xanax. ER-64. Ms. Duncan further explained that she has a history of schizophrenia and involuntary hospitalizations, and that she was suffering from a psychotic episode on November 7 and 9 of 2023. ER-65.

The Government's last witness was SDPD Officer Lehi Jimenez. ER-70. Officer Jimenez testified that he had interviewed a man named "David" outside of

13

Mr. Smith's apartment building on November 9, 2023; David did not want to provide his last name or participate as a witness. ER-72. Per Officer Jimenez, David said he saw man and a woman fighting, with the man pulling the woman to the ground while she yelled for help. ER-72. The man that said he saw a white Chrysler van drive out of the complex, hitting another car along the way. ER-74. Officer McConnell's body camera footage had previously shown Ms. Duncan stating that Mr. Smith left in a white Chrysler van. ER-108.

Mr. Smith called defense investigator Jessica Borges to testify. ER-81. Through Ms. Borges, he introduced several exhibits that challenged the Government's theory of the case. First, Mr. Smith introduced medical records from November 9, 2023, the date that Mr. Smith allegedly strangled Ms. Duncan and hit her in the head multiple times. ER-82–84. The medical provider who treated Ms. Duncan at the emergency room just hours after the incident did not note any significant neck injury or any injury that would be consistent with Ms. Duncan being strangled and losing consciousness. ER-83–84. The records did note that Ms. Duncan was diagnosed with alcohol intoxication delirium. ER-83.

Additionally, Mr. Smith introduced records of multiple applications for harassment restraining orders that Ms. Duncan sought against Makayla and another individual. ER-84–97. Approximately one week before the first alleged violation by

14

Mr. Smith, Ms. Duncan had sought protection from Makayla, stating that she feared Makayla would hurt her or her children. ER-85. In the sworn declaration in support of her application for a restraining order, Ms. Duncan explained that she had been receiving multiple phone calls and texts from strangers asking where she and Mr. Smith were. ER-86. In the background of one of those calls, Ms. Duncan heard Makayla threatening to kill Ms. Duncan and her family. ER-87. Additionally, Ms. Duncan stated that Makayla had previously vandalized her car, smearing blood all over it. ER-88. The San Diego Superior Court granted Ms. Duncan's application for the temporary restraining order. ER-86.

In addition to the October 2023 restraining order, Mr. Smith also introduced a prior application for a restraining order against Makayla that Ms. Duncan had filed in 2017. ER-90. In that application, Ms. Duncan explained that she and Makayla "share the same child's father" (Mr. Smith) and that Makayla had harassed her online and had both verbal altercations as well as physical fights with her starting in 2013. ER-91–92. The San Diego Superior Court also granted that application for the temporary restraining order. ER-93.

Ms. Borges additionally testified that she interviewed Ms. Duncan regarding the alleged incidents on November 7 and 9, 2023. ER-96. According to Ms. Borges's testimony, Ms. Duncan stated that she had been intoxicated and suffering from a

15

psychotic episode on both dates. ER-86. Ms. Duncan also told Ms. Borges that she had been angry at Mr. Smith for having a relationship with Makayla, and she worried about losing custody of her children. ER-96–97.

Finally, Mr. Smith called Supervisory U.S. Probation Officer Belinski. ER-100. Officer Belinski testified that Ms. Duncan had called him on November 13, 2023, and told him that the statements she made to the SDPD officers were untrue and that the police reports were falsified. ER-100–101. After that testimony, the hearing concluded and the district court set the next hearing for January 25, 2024. ER-115.

**F.    Day two of the revocation hearing and sentencing.**

The first witness called by the United States on January 25, 2024, was SDPD Officer Steven Truong. ER-121. Officer Truong testified that he had responded to a radio call about domestic violence occurring at Mr. Smith's apartment on November 7, 2023. ER-122. The Government introduced Officer Truong's body camera footage from that morning; Mr. Smith renewed his hearsay objection to no avail. *Id.* In his testimony, Officer Truong stated that he and his partner "responded to a radio call for domestic violence" occurring at the apartment. *Id.* During the video, Ms. Duncan claims that she did not call 911 for help, and that she believed it must

16

have been a neighbor. ER-154–155. Officer Truong, however, tells her that he believed she had called. ER-155.

After playing the video, the Government questioned Officer Truong further as to the details of the incident, noting that the conversation was "a little fragmented" and the video was "fairly quiet." ER-124. Officer Truong then testified that Ms. Duncan reported that she was in a physical altercation with Mr. Smith in which he struck her, pulled her hair, and vandalized her car. *Id.*

On cross-examination, Officer Truong testified that he believed Ms. Duncan was under the influence of alcohol and drugs, based on her responses and demeanor during their interaction. ER-131–32. Mr. Smith then asked about the dispute as to who actually called 911 on November 7, Ms. Duncan or a neighbor. ER-137. Officer Truong testified that it had been Ms. Duncan. ER-138. Officer Truong explained that they knew it had been Ms. Duncan because when officers respond to a radio call, they are sent details about the call on their mobile laptops. ER-141–42. In this case, Officer Truong stated that they saw that Ms. Duncan "was the reporting party of the call" and that she "reported her tires were popped and she was possibly hit" by Mr. Smith. ER-142.

Mr. Smith then re-called Officer McConnell to question her about Ms. Duncan's recantation call. ER-144. Officer McConnell confirmed that she returned

17

a call from Ms. Duncan, who subsequently explained that Mr. Smith was not the person who assaulted her, but rather it was a woman. ER-143–44.

The parties then engaged in closing arguments. The Government began by highlighting Ms. Duncan's statements to the officers that implicated Mr. Smith. ER-148. It then argued that the officers' investigation corroborated those statements, as Ms. Duncan's injuries were consistent with her testimony as was the scene at the apartment. ER-148–51. The Government argued that Ms. Duncan's recantation call did not provide "a coherent explanation of how it actually happened," but was rather just Ms. Duncan trying to "make it all go away" due to her fear of Mr. Smith. ER-151–52. Finally, the Government argued that Mr. Smith's text message exchange with Ms. Duncan also suggested that he committed the assaults, as he did not deny her accusations but instead stated, "You are embarrassing yourself." ER-152.

Mr. Smith's closing argument acknowledged that the objective evidence did demonstrate that Ms. Duncan had been assaulted, but that the Government had failed to meet its burden of proving that Mr. Smith was the culprit. ER-153–154. Defense counsel noted that the sole eyewitness was Ms. Duncan, who testified under oath that Mr. Smith was not the person who harmed her—and that she was intoxicated and psychotic at the time that she blamed him for the crime. *Id.* In fact, Ms. Duncan had recanted her statement about Mr. Smith twice before the hearing:

18

once by calling Officer McConnell, and once by calling Probation Officer Bilinksi. ER-158. And defense counsel noted that the testimony about the witness named "David" was weak and failed to actually connect Mr. Smith to the crime. ER-160.

Defense counsel also pointed out that, only about a week prior to the attacks, Ms. Duncan had sought a restraining order against a woman she thought was dating Mr. Smith. ER-155. Ms. Duncan had stated in a sworn declaration that Makayla had threatened her and smeared blood on her car. *Id.* Defense counsel noted that the blood on Ms. Duncan's door was not splattered, as would be expected if her head had been slammed against the door, but rather was in an odd circular smudge—as if it had been purposely smeared there in the manner that Makayla had previously smeared blood on Ms. Duncan's car. ER-156.

Defense counsel disagreed with the Government's interpretation of Mr. Smith's text message to Ms. Duncan, stating that Mr. Smith was stating it was "embarrassing" that Ms. Duncan was accusing him of spending all her money on Makayla. ER-157. That jealousy and anger towards Makayla, defense counsel argued, provided a motive for Ms. Duncan to lie and blame Mr. Smith. *Id.* Finally, defense counsel noted that Ms. Duncan's medical records were not consistent with her testimony, nor did the Government present any evidence that Mr. Smith's body

19

showed signs of a fight (such as defensive wounds or bruised knuckles) at the time of his arrest. ER-158.

Mr. Smith also moved under Rule 26.2 for production the 911 call made by Ms. Duncan. ER-154. He argued that Ms. Duncan's testimony should be stricken due to the Rule 26.2 violation, as she was a Government witness and they failed to produce her prior recorded statement. ER-161. Mr. Smith further renewed his argument that he should have a right under *Brady* to exculpatory evidence. ER-167.

The district court denied Mr. Smith's motion for the 911 call, stating that "the Government didn't have an obligation to produce it under Jencks and Rule 26.2(A)." ER-169. It explained that, based on case law out of several circuits, "the Government's obligation under the Jencks Act and Rule 26.2 only extends to information in its possession, custody, or control, not the information possessed by agents not working with the prosecution nor acting on its behalf." ER-170.

The district court then concluded that all four allegations were proven by a preponderance of the evidence. *Id.* It calculated the Guidelines range as 33–41 months, based on a Grade A violation and a Criminal History Category VI. ER-183. However, based on the statutory maximum of 24 months, it sentenced Mr. Smith to 24 months custody with five years supervised release. ER-184.

SUMMARY OF ARGUMENT

Mr. Smith was denied his due process rights to a fair hearing regarding the allegation that he had violated the terms of his supervised release because the Government failed to produce materially exculpatory evidence under *Brady v. Maryland* and also because it withheld the recorded statement of its key witness in violation of Fed. R. Crim. P. 26.2. Mr. Smith was accused of violating the terms of his supervised release on two dates by committing domestic violence under California law against Ms. Duncan, his partner. The State of California did not pursue charges, and the Government elected to proceed with the supervised release violation proceedings and attempt to prove in the first instance that Mr. Smith committed the alleged domestic violence conduct. The Government's case was almost entirely based on statements made by the alleged victim, Ms. Duncan, that were captured on police body cameras. But Ms. Duncan herself contradicted those statements, both before and after she made them.

During the cross examination of Officer Truong, one of the SDPD Officers who responded to the scene, Ms. Duncan made a recorded 911 call where she said that Mr. Smith *possibly* hit her. This statement was far less certain than the contemporaneous statements introduced by the Government where Ms. Duncan said that Mr. Smith assaulted her. For her part, Ms. Duncan denied calling 911 and

claimed that a neighbor made the call. Mr. Smith moved for the production of the recorded 911 call under Fed. R. Crim. P. 26.2 and the district court denied the motion, ruling that the statement was not in the possession of the Government. The district court further denied Mr. Smith's repeated motions for *Brady* evidence throughout the course of the revocation proceedings. These rulings were erroneous for two reasons.

First, the district court should have ordered that Mr. Smith was entitled to exculpatory, impeaching *Brady* evidence in the form of a recording of the alleged victim's 911 call. This Court should find that, contrary to the district court's holding, the constitutional safeguards of *Brady* apply in a contested revocation hearing. This ruling will ensure that contested revocation hearings result in fair and reliable adjudications, and it will also prevent the incongruous result of defendants losing their *Brady* rights where a prosecuting agency determines that the new crime is not fit for prosecution and the Government elects to only proceed with a supervised release violation. In this case, a faithful application of *Brady* precedent demonstrates that Mr. Smith was entitled to a recording of the alleged victim's 911 call, and its suppression was prejudicial as it was strongly favorable to Mr. Smith's defense.

Second, the district court erred by denying Mr. Smith's motion under Federal Rule of Criminal Procedure 26.2 to obtain the 911 call recording. Regardless of

22

*Brady*, that call constituted a prior recorded statement by a Government witness, Ms. Duncan. The district court excluded it on the basis that it was not in the Government's custody and control, but that is directly contrary to Ninth Circuit precedent. The Government's failure to comply with the rule should have resulted in Ms. Duncan's testimony being stricken. Ms. Duncan's credibility was central to the case, and Ms. Duncan's hearsay statements would have been inadmissible without her testimony. The failure to produce this 911 call recording resulted in substantial prejudice to Mr. Smith, and he now respectfully requests that this Court reverse the decision of the lower court and remand for another hearing wherein his due process rights are upheld.

ARGUMENT

**A.      The district court erred by denying Mr. Smith's motion to compel the Government to disclose favorable evidence under *Brady v. Maryland*.**

This Court should reverse and remand because Mr. Smith was prejudiced by the district court's failure to require the Government to provide him with exculpatory and impeaching evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). It has long been established that prosecutors have a duty to learn whether there is any evidence favorable to a defendant in a criminal case and to subsequently disclose that evidence to the defendant. *See Strickler v. Greene*, 527 U.S. 263, 280–81 (1999). In this case, the alleged victim made a call to 911 in which she stated that "her tires

23

were popped and she was possibly hit" by defendant Mr. Smith. ER-142. The equivocal statement that Mr. Smith *possibly* hit Ms. Duncan is in sharp contrast to Ms. Duncan's statements admitted through the body camera footage when she told the officers that Mr. Smith hit her. ER-142; ER-224.

The district court denied Mr. Smith's motion to compel, holding that *Brady* does not apply in a revocation hearing. ER-128; ER-169. While this has been an open question in the Ninth Circuit, this Court should now hold that *Brady* does apply in the context of a contested revocation hearing involving new criminal conduct that has never been adjudicated. Further, because the suppression of this evidence prejudiced Mr. Smith and "undermines confidence in the outcome" of the hearing, *Comstock v. Humphries*, 786 F.3d 701, 712 (9th Cir. 2015), this Court should reverse the judgment against Mr. Smith and remand for a new revocation hearing.

1. **The Standard of Review is *de novo*.**

Where a defendant has raised the issue of a *Brady* violation in the district court, it is considered a question of law, and thus this Circuit reviews it *de novo*. *United States v. Lehman*, 792 F.2d 899, 901 (9th Cir. 1986).

24

**2.    *Brady* should apply to revocation hearings as well as criminal trials.**

This Court should hold that the due process rights secured to defendants in *Brady v. Maryland*, 373 U.S. at 37, apply not only in their original criminal prosecutions, but in any subsequent proceedings related to the revocation of supervised release when the revocation allegations are new and unproven criminal conduct. In this case, the State of California did not press any criminal charges against Mr. Smith for the domestic violence incidents that formed the basis of his revocation proceedings. Had the State charged Mr. Smith, he would have been entitled to *Brady* evidence in confronting the criminal charges, in addition to the right to a jury trial where the State would need to prove his guilt beyond a reasonable doubt. But because the United States proceeded with a revocation despite the lack of a criminal conviction, Mr. Smith's ability to defend his case was severely hampered, thus putting the fundamental fairness of the proceeding into question. The Government should not be allowed to eliminate its *Brady* obligations through electing to proceed only with a violation of supervision. A review of the revocation hearing context, the purpose behind *Brady*, and the due process balancing factors all demonstrate that defendants deserve the same access to exculpatory and impeachment evidence when accused of previously uncharged

25

criminal conduct at a revocation hearing as they receive when accused of a new federal crime.

    a.  Defendants accused of a supervised release revocation are entitled to due process under the United States Constitution.

First, it should be noted that supervised release revocations are common and have substantial consequences. Federal district court judges impose supervised release in the vast majority of cases.[2] In 2023, over 110,000 people were on supervised release,[3] and the average term imposed was 47 months.[4] Studies have shown that approximately 25% of defendants given a term of supervised release will have that supervise release revoked within 3 years, whether due to new criminal conduct or simply a technical violation.[5] In a review of revocation hearings between 2013 and 2017, the U.S. Sentencing Commission determined that violators were

---

[2] For example, supervised release was imposed in 82.5% of cases in 2023—and that figure rises to 88.7% if immigration cases are not included.  U.S. Sent'g Comm'n, 2023 Annual Report, at 18, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/2023-Annual-Report.pdf.

[3] U.S. Courts, Federal Judicial Caseload Statistics 2023, https://www.uscourts.gov/statistics-reports/federal-judicial-caseload-statistics-2023.

[4] U.S. Sent'g Comm'n, *supra* n.2, at 18.

[5] James L. Johnson, Federal Post-Conviction Supervision Outcomes: Rearrests and Revocations, 87 *Federal Probation Journal* (Sept. 2023), at 7, https://www.uscourts.gov/file/78377/download.

sentenced to an average of 21 months for Grade A violations, 12 months for Grade B violations, and 8 months for Grade C violations.[6]

Although defendants accused of a supervised release violation have fewer procedural safeguards than a defendant in a criminal trial,[7] they are still entitled to constitutional due process protections. *See Morrissey v. Brewer*, 408 U.S. 471, 484 (1972). In *Morrissey*, the Supreme Court analyzed whether Fifth Amendment[8] due process rights should apply in the context of parole revocations.[9] The Court began by acknowledging that a revocation proceeding "is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding" are not guaranteed. *Id.* at 480. "Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special [supervisory] restrictions." *Id.* Still, the Court

---

[6] U.S. Sent'g Comm'n, Federal Probation and Supervised Release Violations (Jul. 2020), at 35, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2020/20200728_Violations.pdf.

[7] At a supervised release revocation hearing, neither the Federal Rules of Evidence nor the Sixth Amendment right to confront witnesses applies. *See* Fed. R. Evid. 1101(d)(3); *United States v. Hall*, 419 F.3d 980, 985 (9th Cir. 2005).

[8] The Fifth Amendment of the U.S. Constitution, of course, states that no person shall "be deprived of life, liberty, or property, without due process of law."

[9] While *Morrissey* technically dealt with parole revocations, this Court has noted that "[p]arole, probation, and supervised release revocation hearings are constitutionally indistinguishable and are analyzed in the same manner." *See Hall*, 419 F.3d at 985 n. 4.  For this reason, this Brief will broadly use the term "supervision" to refer to all three types of post-conviction conditional release.

recognized that a defendant released on supervision still has many more rights and expectations than an incarcerated person, as he "may be living a relatively normal life at the time he is faced with revocation." *Id.* at 482. Due to the possibility of a lengthy incarceration as a result, a revocation of supervision (parole, probation, or supervised release) is a loss of liberty and thus "inflicts a grievous loss" that is cognizable under the Fifth Amendment. *Id.* at 482.

In determining "the nature of the process that is due" in the revocation context, the *Morrissey* Court balanced various interests to determine that an "effective but informal hearing" was appropriate. *Id.* at 484–85. First, it noted that the state has an "overwhelming" interest in reimprisoning a defendant who has violated conditions of supervision without the burden of a full trial. *Id.* at 483. The Government has *no* interest, however, in revoking supervision "without any procedural guarantees at all." *Id.* at 484. On the other hand, the Court identified that both the defendant and society as a whole have "an interest in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke [supervision], given the breach of [supervision] conditions." *Id.* at 484. Society also has an interest in restoring criminal offenders to productive citizens, and that rehabilitation is more likely to occur in a system that has basic fairness and is not marked by arbitrariness. *Id.* Given these competing

28

interests, the Court set out "minimum requirements of due process" in a revocation case. *Id.* at 489.[10]

Adding additional due process protections, the Supreme Court would go on to expand *Morrissey* when it confirmed that the right to counsel exists in the context of a contested revocation hearing. In *Gagnon v. Scarpelli*, the Court addressed the role of probation officers at a revocation hearing, and how seeking revocation changes them from a primarily supervisory position into a punitive one. 411 U.S. 778, 785 (1973) ("Even though the officer is not by this recommendation converted into a prosecutor committed to convict, his role as counsellor to the probationer or parolee is then surely compromised."). It then stated that to comport with a defendant's due process rights at a revocation hearing, there must be an "accurate finding of fact" to settle disputes between a defendant and a probation officer regarding revocation. *Id.* But an accurate finding of fact would be inherently difficult without counsel for the accused, as "the unskilled or uneducated probationer or

---

[10] These included: (1) written notice of the alleged violations; (2) disclosure to the defendant of evidence against him; (3) opportunity to be heard in person and to present witnesses and documentary evidence; (4) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation; (5) a neutral and detached hearing body; and (6) a written statement by the factfinders as to the evidence relied upon and reasons for revoking supervision. *See Morrissey*, 408 U.S. at 489. These rules were essentially codified in Federal Rule of Criminal Procedure 32.1.

29

parolee may well have difficulty in presenting his version of a disputed set of facts where the presentation requires the examining or cross-examining of witnesses or the offering or dissecting of complex documentary evidence." *Id.* at 787. Thus, the *Gagnon* Court concluded that there are "certain cases in which fundamental fairness—the touchstone of due process—will require that the State provide at its expense counsel for indigent probationers or parolees." *Id.* at 790.

The Supreme Court has even recently expressed that Fifth and Sixth Amendment rights are perhaps even more crucial in the supervised release system than they were in the parole system that *Morrissey* addressed. *See United States v. Haymond*, 588 U.S. 634, 652 (2019) (finding unconstitutional a mandatory sentence enhancement for certain violations of supervised release). This is because, "[u]nlike parole, supervised release wasn't introduced to replace a portion of the defendant's prison term, only to encourage rehabilitation *after* the completion of his prison term." *Id.* (citing United States Sentencing Commission, Guidelines Manual ch. 7, pt. A(2)(b) (Nov. 2012); Doherty, *Indeterminate Sentencing Returns: The Invention of Supervised Release*, 88 N. Y. U. L. Rev. 958, 1024 (2013) (internal quotations omitted)). The *Haymond* Court reasoned that "that structural difference bears constitutional consequences," as it could theoretically result in a defendant receiving

more custody on supervised release revocations than was originally authorized by the jury. *Id.*

> b.  The constitutional safeguards established in *Brady v. Maryland* should apply to contested revocation hearings to ensure defendants receive the process which they are due.

This Court should hold that *Brady v. Maryland* applies in the context of a contested revocation hearing when there are allegations of unproven criminal conduct in order to ensure due process for defendants, as well as to protect the societal interest in fair and accurate hearings that "comport with standards of justice." *See* 373 U.S. at 88. In *Brady*, a prosecutor failed to disclose a witness's confession to the crime. *Id.* at 85. The defendant was tried, convicted, and sentenced before he learned about this clearly exculpatory evidence; he thereafter moved for a new trial and was denied. *Id.* The Supreme Court determined that he was in fact entitled to a new trial, holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The *Brady* Court reasoned that the good faith of the prosecutor was irrelevant, as the purpose for the rule was not punishment of prosecutorial misconduct but rather the "avoidance of an unfair trial to the accused." *Id.* "Society wins not only when the guilty are convicted but when criminal

31

trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Id.*

Since *Brady*, the Supreme Court has continued to expand the rule: both in terms of the types of material that must be disclosed as well as the types of situations where it applies. In *Giglio v. United States*, the Court held that in addition to exculpatory evidence, impeachment evidence must also be disclosed to the accused. 405 U.S. 150, 154–55 (1972). The Court went on to hold in *United States v. Agurs* that a prosecutor must disclose *Brady* evidence even where it was not requested by the defendant. 427 U.S. 97, 110 (1976). In *Kyles v. Whitley*, the Court imposed an affirmative duty on the prosecutor to learn of any possible *Brady* evidence, holding that the rule encompasses evidence "known only to police investigators and not to the prosecutor." 514 U.S. 419, 437–38 (1995). Neither the Supreme Court nor the Ninth Circuit, however, have explicitly addressed whether the *Brady* safeguards apply in the context of revocation hearings.

The Supreme Court did rule that *Brady* does not apply in the context of a petition for post-conviction relief, *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52 (2009), but that case is distinguishable from the issue in the instant appeal. In *Osborne*, a criminal defendant who had "already been found guilty at a fair trial," *id.* at 68, asserted his *Brady* rights in an attempt to compel the state

32

Government to provide him with DNA evidence that he had not received during trial. The Supreme Court determined that *Brady* was "the wrong framework" for his particular due process challenge, given that he was no longer "presumed innocent" of the crime, but rather had had already been convicted and "the case was closed." *Id.* at 68–69.

*Brady* is an appropriate vehicle to seek favorable evidence in the revocation context when the Government alleges new and unproven criminal conduct because the defendant has not yet "been found guilty at a fair trial" of committing the alleged violation. Mr. Smith sought favorable evidence prior to the final adjudication of his revocation proceeding that alleged new and unproven criminal conduct; his goal was to *increase the certainty of a fair hearing*, as opposed to challenging the outcome of an existing, presumably fair trial. In fact, the district attorney declined to prosecute Mr. Smith, meaning that—unlike the defendant in *Osborne*—Mr. Smith never had the opportunity to obtain *Brady* evidence that was material to his defense in an underlying criminal prosecution. By charging Mr. Smith with a violation of his supervised release conditions based on conduct that did not result in a conviction, the United States was essentially able to do an end run around Mr. Smith's *Brady* rights, thus diminishing the reliability of the adjudication.

Rule 32.1 is silent on whether *Brady* applies in supervised release proceedings, and several Ninth Circuit decisions have suggested that "due process may require more than simple adherence to Rule 32.1(a)(2)." *See United States v. Dixon*, 187 F. Supp. 2d 601, 603 (S.D.W. Va. 2002) (citing to *United States v. Donaghe*, 924 F.2d 940, 944 (9th Cir.1991); *United States v. Tham*, 884 F.2d 1262, 1265 (9th Cir.1989)). In both *Donaghe* and *Tham*, this Court addressed whether there had been a violation of Rule 32.1 *or* due process where probationers were not permitted to view their probation files prior to a revocation hearing. The Court held in both cases that there had been no violation, but neither of these cases involved a request for exculpatory material similar to Mr. Duncan's 911 call in Mr. Smith's case.

First, in *Tham*, this Court noted that because the file "was not used as evidence" against the probationer, there was "was no violation of the Rule *or* of due process." *Tham*, 884 F.2d at 1265 (emphasis added). The *Tham* Court further stressed that the probationer had been able to cross-examine all witnesses against him. *Id.* In *Donaghe*, this Court cited to *Tham* in its similar holding that the probationer's rights under either Rule 32.1(a)(2) *or* due process were not violated by the failure to produce the probation file. *Donaghe*, 924 F.2d at 944 (citing *Tham*, 884 F.2d at 1265). This was because the "government did not offer any evidence in its case in chief from these records, nor did it introduce them into evidence." *Id.*

34

Crucially, this Court specifically found that "nothing occurred here that was even remotely unfair" to the probationer and that despite the failure to disclose the probation records, [f]ull cross-examination of the government witness went forward unimpeded." *Id.*

While these cases might appear to limit the rights of a defendant in the revocation context, a closer look at this Court's reasoning actually supports the idea that *Brady* rights should apply in contested hearings. Again, neither of the probationers in either case asserted that any of the requested files constituted favorable exculpatory or impeachment evidence that would trigger their *Brady* rights. Thus, the holdings do not specifically preclude the possibility of *Brady* rights applying in the revocation context. *Donaghe* and *Tham* instead stand for the proposition that a defendant in a contested revocation hearing is protected by *both* the strictures of Rule 32.1 *and* due process rights. This suggests that Rule 32.1 is not an exhaustive list of all the due process rights owed to an individual at a revocation hearing, nor does it create some type of ceiling on the process that is due to them. This principle is further supported by the language of the *Morrissey* decision, which set forth "the minimum requirements of due process." 480 U.S. at 488–89. And this reading is buttressed by *Haymond's* acknowledgment that due process

35

protections may be more necessary under the supervised release system than they were under the previous parole system that *Morrissey* addressed. 588 U.S. at 655.

An application of the due process analysis, as well as the underlying rationale behind cases like *Morrissey*, supports this extension of *Brady*. In *United States v. Ruiz*, 536 U.S. 622 (2002), the Supreme Court clarified that when determining whether *Brady* should be applied in a new context, courts must use the classic due process analysis as laid out in prior Supreme Court precedent such as *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985). That test involves balancing three factors: (1) "the private interest that will be affected by the action of the State"; (2) "the governmental interest that will be affected if the safeguard is to be provided"; and (3) "the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." *Id.* (citing *Little v. Streater*, 452 U.S. 1, 6 (1981); *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). The *Ake* Court addressed the crux of due process analysis in the context of a criminal case, stating:

> Meaningful access to justice has been the consistent theme of these cases. We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.

*Id.*

All of the factors outlined in *Ake* favor expanding *Brady* to supervised release proceedings when the underlying allegations are new and unproven criminal conduct. Turning to the first factor in the due process analysis, the primary private interest involved is the liberty of a criminal defendant who has been released on supervision. As the Supreme Court noted in *Ake*, "[t]he private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling." *Id.* at 78. And while supervised individuals do not enjoy total liberty but rather conditional liberty based on their ability to comport with the terms of their supervised release, the Supreme Court in *Morrissey* acknowledged that revocation inflicts a "grievous loss," 408 U.S. at 422, and in *Gagnon* called it a "serious deprivation," 411 U.S. at 781. The safeguards at *Brady* are there to ensure accurate fact-finding, and the supervised individual has a strong interest in a fair hearing so that "his liberty is not unjustifiably taken away." *Gagnon*, 411 at 785.

But there is not just an individual defendant's interest in ensuring accuracy at a revocation hearing. As the Supreme Court explained in *Morrissey*, society as a whole is affected by the success of a criminal defendant's rehabilitation while on supervision, and thus society has an interest in ensuring that revocation hearings are

37

fairly conducted. 408 U.S. at 484 ("Society has a stake in whatever may be the chance of restoring [the supervisee] to normal and useful life within the law."). The *Gagnon* Court similarly addressed this issue, noting that the State has its own interest in safeguarding due process rights at a revocation hearing to make certain that the Government does not "unnecessarily interrupt[] a successful effort at rehabilitation." 411 U.S. at 785.

Turning to the second due process factor, the application of *Brady* to the revocation hearing context should cause minimal interference with Government interests. *Morrissey* acknowledged that the Government has an "overwhelming" interest in being able to revoke supervision "without the burden of a new adversary criminal trial if in fact [the defendant] has failed to abide by the conditions of his parole." 408 U.S. at 483. For this reason, the *Morrissey* Court found that, while due process required certain safeguards in the revocation context, it was still imperative that the revocation process not be an "inflexible structure." *Id.* at 490. But the application of *Brady* in this new context will not remove all flexibility from a revocation hearing. First, *Brady* disclosure would not be required in every case, because as the Supreme Court noted in *Gagnon*, revocation frequently occurs without a factual dispute, such as when it is based on a new conviction. *See* 411 U.S at 787. Just as with criminal allegations, the vast majority of allegations of a

38

supervised release violation result in the admission of guilt by the defendant. Further, there are still substantial assurances that contested revocation hearings will remain easier and less formal than a typical criminal trial, as the Federal Rules of Evidence and Sixth Amendment confrontation rights still would not apply. Thus, applying *Brady* in this context would not erase the distinction between a criminal trial and a revocation hearing that was stressed in *Morrissey*.

Finally, turning to the final factor, bringing the *Brady* rights to defendants at contested revocation hearings can substantially increase the likelihood of fairness and accuracy at these proceedings. The *Morrissey* Court held that individuals facing revocation must be given the due process rights to present evidence and cross-examine adverse witnesses, absent a finding of good cause. 408 U.S. at 489. *Brady* disclosure would give those individuals evidence that may establish factual innocence and be used to impeach adverse witnesses, both of which directly implicate the rights preserved in *Morrissey*. Indeed, the right to present evidence is hardly robust when a defendant may not even be able to obtain exculpatory evidence. Similarly, the right to cross-examine adverse witnesses is severely handicapped by a failure to disclose crucial impeachment evidence. Thus, applying *Brady* to revocation hearings would not actually be a substantial expansion of due

39

process, but rather a manner to guarantee that each defendant in a revocation hearing can fully realize the benefit of the due process rights guaranteed in *Morrissey*.

In sum, the balancing of all the due process factors favors the application of *Brady* to the revocation context. The interest of a supervised individual facing revocation is "uniquely compelling," *see Ake*, 470 U.S. at 77, especially when it involves accusations of new crimes that have not been proven by a jury trial. This interest is then joined by a similarly important societal interest in ensuring fair revocation hearings. *See Morrissey*, 408 U.S. at 484. While there is no denying the State has its own compelling interest in avoiding excessive burdens and unnecessary procedural hurdles in the revocation context, *see id.* at 483, the addition of *Brady* safeguards to the revocation context would not be a "radical" change resulting in a "comparatively small" constitutional benefit, *see Ruiz*, 536 U.S. at 632. Instead, "*Brady* disclosure at revocation could amount to a comparatively small change for a potentially radical benefit." Alex Breindel, *Does* Brady *Apply to Supervised Release Revocation Hearings?*, 91 Fordham L. Rev. 127, 158 (2022).

### 3.    A *Brady* violation occurred in this case.

Applying the *Brady* factors to the instant case, Mr. Smith was the victim of a *Brady* violation that undermines confidence in the outcome of his revocation hearing. To prove that a *Brady* violation occurred, a defendant must demonstrate

three things: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the Government, either willfully or inadvertently; and (3) prejudice ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Here, the alleged victim in the case made a 911 call that was favorable evidence to Mr. Smith, but Mr. Smith was denied access to the recording of the call. The suppression of this material evidence prejudiced Mr. Smith, hamstringing his ability to cross-examine witnesses and resulting in a markedly weaker case for the defense. Because there is at least a reasonable probability that the outcome of the revocation hearing would have been different if Mr. Smith had obtained this *Brady* evidence, this Court should reverse and remand for a new hearing.

  a. The 911 call was favorable to Mr. Smith.

  First, Mr. Smith can establish that the 911 call was favorable to him. Evidence is considered favorable if it is either exculpatory or impeaching. *Id.* "If information would be advantageous to the defendant or would tend to call the government's case into doubt, it is favorable." *Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015) (internal quotations and citations omitted). Crucially, "whether evidence is favorable is a question of substance, not degree, and evidence that has any affirmative, evidentiary support for the defendant's case or any impeachment

41

value is, by definition, favorable." *Id.* (citing *Strickler*, 527 U.S. at 281–82). Evidence

thus may be favorable to a defendant "even if its value is only minimal." *Id.* (citing

*Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013)). When determining whether

evidence is "exculpatory," it is not a prerequisite that "it benefits the defense in every

regard or . . . will result in the defendant's acquittal." *United States v. Bruce*, 984 F.3d

884, 895 (9th Cir. 2021) (citing *Bailey v. Rae*, 339 F.3d 1107, 1115 (9th Cir. 2003)).

In this case, the relevant evidence plainly fits under the umbrella of

"favorable" evidence. First, it is potentially exculpatory. According to Officer

Truong, on her call to 911, Ms. Duncan stated that her tires were popped and she

was "possibly" hit by Mr. Smith. ER-142. The fact that Ms. Duncan stated that Mr.

Smith *possibly* hit her suggests that Mr. Smith might not have hit her—that perhaps

in her intoxicated state, she wasn't sure what Mr. Smith did, or whether someone

other than Mr. Smith might have hit her. Although the prosecutor might have

believed that this evidence was not likely to substantially assist Mr. Smith's defense

given the other evidence presented, favorability is a "question of substance, not

degree." *See Comstock*, 786 F.3d at 708. Therefore, even if it had only "minimal"

exculpatory value, this evidence was clearly favorable because it was "advantageous to

the defendant or would tend to call the government's case into doubt." *Id.* Further,

the 911 call was also evidence that could be used to impeach Ms. Duncan. Given

42

that she definitively identified Mr. Smith as the perpetrator, ER-224, her
equivocation and uncertainty right after the event occurred cast doubt on her later
statements. For these reasons, Mr. Smith can establish the first prong of the *Brady*
test.

> b.  The 911 call was suppressed.

Additionally, Mr. Smith can demonstrate the second prong of the *Brady* test,
as the 911 call was suppressed. "Evidence is 'suppressed' where it is known to the
State and not disclosed to the defendant." *Strickler*, 527 U.S. at 282. A defendant
need not make a specific request for the evidence. *Id.* at 280. A prosecutor's duty to
disclose favorable evidence does not simply encompass evidence known to the
prosecutor; rather, evidence known only to law enforcement falls within the purview
of the *Brady* obligation. *Kyles*, 514 U.S. at 438. For this reason, *Brady* is viewed as
imposing an "affirmative" duty on the prosecution, requiring it "to learn of any
favorable evidence known to the others acting on the government's behalf in [the]
case, including the police." *Strickler*, 527 U.S. at 281. A defendant may satisfy the
suppression prong of *Brady* even where "a record is not conclusive as to whether the
individual prosecutor [or investigator] ever actually possessed the *Brady* material."
*United States v. Price*, 566 F.3d 900, 910 (9th Cir. 2009) (internal quotations omitted)
(citing *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997)).

43

The 911 call was indisputably suppressed in this case. While not required to do so, Mr. Smith filed pretrial motions seeking all exculpatory evidence. ER-203. Officer Truong, who was working with the prosecutor in this case, was aware of the existence of the 911 call. The prosecutor also had presumably reviewed the body camera footage in which Ms. Duncan and the officers discuss her 911 call. But despite that knowledge, the Government failed to produce a recording of the 911 call to Mr. Smith. And when Mr. Smith made a motion for the 911 call during the hearing, the district court denied it. ER-154. Given these circumstances, Mr. Smith also satisfies the second *Brady* prong.

      c.  Mr. Smith was prejudiced by the suppression of the 911 call.

Finally, Mr. Smith can establish a *Brady* violation by demonstrating that he meets the third prong involving prejudice. "The suppression of favorable evidence is prejudicial if that evidence was 'material' for Brady purposes." *Comstock*, 786 F.3d at 710 (citing *Strickler*, 527 U.S. at 282). Evidence is "material" where it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290. A defendant need not show that disclosure of the suppressed evidence would result in an acquittal; rather, it is sufficient to demonstrate "a 'reasonable probability' of a different result." *United States v. Bagley*, 473 U.S. 667, 678 (1985). And reasonable probability does not refer

to reasonable probability of a full acquittal—even if "the withheld evidence would have altered at least one juror's assessment," that is sufficient to find materiality. *Price*, 566 F.3d at 914 . One sign that evidence is material is if the prosecutor's closing argument strongly relied on that evidence. *Id.* (citing *Kyles*, 544 U.S. at 444) (finding that impeachment evidence on a key witness was material where that witness's testimony "was the linchpin of the State's case").

Evidence that uniquely connects an alleged criminal to an offense or impeaches crucial witnesses is particularly material, even where there is evidence supporting a conviction. For example, in *Horton v. Mayle*, the testimony of an alleged witness was "the glue that held the prosecution's case together." 408 F.3d 570, 579 (9th Cir. 2005). He testified that the defendant had confessed to the crime, and was "the only 'direct' evidence that connected [the defendant] to the crime," as there was no fingerprints, DNA evidence, or eyewitness testimony placing the defendant at the scene (although some other witnesses had corroborated his testimony). *Id.* This Court held, therefore, that it was a *Brady* violation for the prosecutor to fail to disclose that witness's deal with the Government, because it was material impeachment evidence. *Id.* at 581. In *Kyles v. Whitley*, a prosecutor suppressed prior statements by alleged eyewitnesses that were made contemporaneously to the crime, that contradicted their later statements and testimony. 514 U.S. at 44. The Supreme

45

Court determined that those suppressed statements were material, and thus a *Brady* violation occurred, noting that "the evolution over time of a given eyewitness's description can be fatal to its reliability." *Id.* The *Brady* violation was found despite the existence of physical evidence linking the defendant to the crime (the murder weapon and the victim's purse were found at his home) and that his defense theory of being framed for the crime was potentially "implausib[le]." *Id.* at 461 (Scalia, J., dissenting).

In this case, Mr. Smith was prejudiced because the suppressed 911 call was both exculpatory and impeaching, as it suggested that the alleged victim, Ms. Duncan, was not absolutely certain in her identification of Mr. Smith as the perpetrator of her assault, and it also contradicted her later statements. Ms. Duncan's identification of Mr. Smith as her assaulter was absolutely the "linchpin" of the Government's case. *See Kyles*, 544 U.S. at 444. Ms. Duncan was the victim of both assaults and also the only witness to what occurred in the apartment, where the assaults were alleged to have occurred. Ms. Duncan's identification of Mr. Smith as the assailant was heavily relied upon during the Government's closing argument, and in fact was the leading piece of evidence the Government presented. ER-148. This focus by the prosecutor on Ms. Duncan's statements demonstrates the materiality of her prior contradictory and exculpatory statements. *See id.* Ms.

Duncan's 911 call would have allowed Mr. Smith to "impeach a key prosecution witness sufficiently to undermine confidence in the verdict." *Comstock*, 785 F.3d at 711. And it is of no import that Mr. Smith had already unsuccessfully attempted to impeach Ms. Duncan with her later recantation, as a second contradictory statement may have made that initial impeachment "take[] on an even greater importance." *See Benn v. Lambert*, 283 F.3d 1040, 1055 (9th Cir. 2022).

The suppression of the 911 call recording is similar to the suppression of the material evidence in *Horton* and *Kyles*. First, as in *Horton*, Ms. Duncan was "a key prosecution witness," *see Comstock*, 786 F.3d at 711, and was essentially the only "direct" evidence connecting Mr. Smith to the scene, *see Horton*, 408 F.3d at 579. As in *Horton*, there was no evidence of Mr. Smith's DNA on Ms. Duncan or any defensive wounds on Mr. Smith. *See id.* And there was no direct eyewitness testimony placing him there, merely a vague piece of unreliable testimony from an unidentified, noncooperative witness who claimed to see "a couple" fighting and a similar car. ER-72–74. And even the Government agreed that witness's testimony, if credited, was insufficient to prove the allegations. ER-108. In *Horton*, there also was some corroboration by other witnesses, but it was not sufficient to overcome the Government's suppression of evidence that would have potentially discredited the key witness. 408 F.3d at 579. Additionally, as with the impeachment evidence in

47

*Kyles*, the Government here suppressed contemporaneous statements of Ms. Duncan that she later contradicted, multiple times, in later statements. The Supreme Court in *Kyles* stressed the significance of changes over time in a witness's recollections of a crime. 514 U.S. at 44. The *Kyles* Court found the prior inconsistent statements of eyewitnesses to be material, even though there was far more inculpatory physical evidence in that case than there is here. *See id.* at 461 (Scalia, J., dissenting).

Reviewing the 911 call "in the context of the entire record," *Agurs*, 427 U.S. at 112, its materiality is evident. There is no doubt that the introduction of *another* contradictory statement by the alleged victim would have "resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles*, 514 U.S. at 441. The production of that evidence may not have led the district court to find against the Government (though, importantly, the district court never stated this on the record), but Mr. Smith need not prove that definitively. *Bagley*, 473 U.S. at 678. Rather, there is a "reasonable probability" here that there would have been a different result, *see id.*, as the 911 recording would have "impeach[ed] a key prosecution witness sufficiently to undermine confidence in the verdict," *see Comstock*, 786 F.3d at 711. Thus, under Supreme Court and Ninth Circuit precedent, Mr. Smith was prejudiced by the suppression of this favorable evidence.

48

Due to the *Brady* violation, this Court should reverse and remand for a new revocation hearing.

**B.    The Government failed to provide Ms. Duncan's prior recorded statement calling the police in violation of Fed. R. Crim. P. 26.2 and her testimony should therefore be stricken.**

The Government used body camera footage, over Mr. Smith's hearsay objection, to introduce Ms. Duncan's recorded statement to the police that she did not call 911 for the truth of the matter asserted. ER-31; ER-122. Ms. Duncan testified that she did not make any recorded statements relating to her testimony, and the body camera footage introduced showed Ms. Duncan definitively stating that Mr. Smith attacked her. ER-67. However, the Government later called Officer Truong, who testified that Ms. Duncan had in fact called 911 "regarding her child's father, where she reported her tires were popped and she was possibly hit" and that this information was available to him on a mobile laptop. ER-142. As argued above, this statement should have been produced as *Brady* evidence, but even if the Court rules that it is not discoverable under *Brady*, it still must be produced as a prior statement of a Government witness under Fed. R. Crim. P. 26.2.

Upon learning of the 911 call, Mr. Smith moved "for that to be produced under Rule 26.2" because it "is a prior statement of a Government witness that pertains to the hearing." ER-154. The district court denied the request without

49

reviewing the 911 call, or the information available to Officer Truong on his mobile laptop, and ruled that it did not need to be produced because it was "not possessed by the United States." ER-169. This ruling was an error requiring remand and retrial.

### 1.    The standard of review is de novo.

Mr. Smith moved for production of the 911 call under Rule 26.2 and the district court ruled that it was not producible because it was not in the custody and control of the United States. This ruling is reviewed *de novo*. *United States v. Cedano-Arellano*, 332 F.3d 568, 570 (9th Cir. 2003).

### 2.    Ms. Duncan's 911 call is a statement under Rule 26.2(f)(2) and it was in the custody and control of the Government.

The Jencks Act, 18 U.S.C. § 3500, and Fed. R. Crim. P. 26.2 require production of a witness's prior statement after they have testified on direct examination for the Government. The language in the rules is very similar, and they are often referred to interchangeably. *See e.g.*, *Cedano-Arellano*, 332 F.3d at 570 . While the Jencks Act applies to a criminal trial, Rule 26.2 applies to a supervised release violation hearing. *See* Fed. R. Crim. P. 32.1(e).

Federal Rule of Criminal Procedure 26.2(a) mandates that after a witness has testified for the Government on direct examination, the Government upon request must produce "any statement of the witness that is in their possession and that

50

relates to the subject matter of the witness's testimony." A statement is defined as "a substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in any recording or any transcription of a recording." Fed. R. Crim. P. 26.2(f)(2).

> a. Ms. Duncan's 911 call is a statement under Fed. R. Crim. P. 26.2(f)(2) because it is a "contemporaneously recorded recital of the witness's oral statement that is contained in a recording."

The 911 call falls directly under the plan language of Rule 26.2(f)(2). It is a contemporaneous verbatim recording of what Ms. Duncan reported to the police. *See* Fed. R. Crim. P. 26.2(f)(2). Officer Truong testified that he learned that Ms. Duncan called 911 on November 7th "regarding her child's father, where she reported her tires were popped and she was possibly hit." ER-142. In response to the 911 call, the police responded to Ms. Duncan's apartment and Mr. Smith is alleged to have been the person who hit her, which was a violation of the conditions of his supervised release. Thus, it is also plainly related "to the subject matter of [Ms. Duncan's] testimony" because it is the call she placed to the police on November 7th describing that the father of her child "possibly hit" her.

> b. The Government possessed the 911 call because the San Diego Police Department was the lead investigative agency.

The context of the hearing demonstrates that SDPD was the lead investigative agency, thus imputing its possession to the United States. The Government called

51

four SDPD Officers and Ms. Duncan as its witnesses to prove that Mr. Smith

violated the terms of his supervised release. It submitted SDPD body camera and

photographs to support its case. ER-122; ER-126. SDPD Officer Truong testified

that Ms. Duncan made the 911 call where she reported that she was "possibly hit" by

Mr. Smith. ER-142. Yet the district court declined to order the Government to

produce the 911 call because it concluded that the 911 call was not within the

custody and control of the Government. ER-169.

The district court's ruling is in error because the Government possesses an

item for discovery purposes if the prosecutor has "knowledge of and access to the

documents sought by the defendant in each case." *United States v. Bryan*, 868 F.2d

1032, 1036 (9th Cir. 1989). Courts take a case-by-case approach to determine which

investigating agency or agencies are involved in the investigation of the defendant in

order to determine what information is possessed by the prosecutor. *United States v.

Cano*, 934 F.3d 1002, 1025 (9th Cir. 2019), rehearing and rehearing en banc

denied, 973 F.3d 966 (9th Cir. 2020), certiorari denied, 141 S.Ct. 277 (2021). The

Government possesses information held by a state police department if the state

police are the lead investigating agency. *Price*, 566 F.3d at 903 .

*Price* is instructive for why the 911 recording in the SDPD's possession was

effectively in the Government's possession because the SDPD was the lead

investigating agency. The Government charged Price with being a felon in possession of a firearm after a gun was found on the seat of his car during a traffic stop conducted by Portland Police Department. 566 F.3d at 902. In addition to Price's proximity to the gun in the car, the Government called Antoinette Phillips as a witness, who testified that she saw Price with the gun in his waistband fifteen minutes before the traffic stop. *Id.* At trial, the Government did not disclose that Ms. Phillips had "a lengthy history of run-ins with the Portland police that suggests that she has little regard for truth and honesty." *Id.* at 903. Price was convicted and later learned of the withheld impeachment information. *Id.* The Government opposed Price's motion for a new trial by arguing that it did not error in failing to disclose the impeachment information because it was in the possession of the Portland Police Department, not the United States Attorney who prosecuted Price for being a felon in possession of a firearm. *Id.* This Court disagreed with that position and held the information in the possession of the Portland Police Department was in the possession of the Assistant United States Attorney prosecuting Smith because the Portland Police Department was the investigating agency. *Id.* The Court reversed Price's conviction because his *Brady* rights were violated by the Government's failure to produce impeachment information in the possession of the Portland Police Department. *Id.*

53

Mr. Smith's case is similar to the circumstances in *Price* because the SDPD was the agency investigating Mr. Smith's violation conduct on behalf of the United States Attorney. The Government obtained police reports, body camera footage, witness interviews and called four SDPD officers as witnesses to prove its case. Thus, just as in *Price*, the information in possession of the SDPD was effectively in the possession of the United States Attorney.

In fact, the district court itself appeared to contradict its own position in an earlier ruling during the case in which it ordered the Government to obtain evidence from the SDPD. During the January 4th hearing, the Government called Officer McConnell who testified that she had an additional recorded conversation with Ms. Duncan. ER-65. Mr. Smith objected under Rule 26.2, and the Government was ordered to produce the recording and make Officer McConnell available at the following hearing for cross examination once the statement was produced. ER-106. The Government did not argue that the statement was not in its custody and control because it was possessed by the SDPD; rather the Government assured the district court it could obtain the recording within 11 or 12 business days. ER-104. Officer McConnell returned to court at the next hearing date and was cross examined regarding the newly produced report. ER-143. The district court's later ruling that Ms. Duncan's 911 recording was not in the custody and control of

54

the Government because it was in the custody of the SDPD, ER-169, is squarely in contrast to how it resolved the prior Rule 26.2 motion for Officer McConnell's prior statement.  Therefore, the 911 call was in the custody and control of the Government, because it was possessed by the SDPD, the lead investigative agency.

3. **The Government's failure to produce the 911 call harmed Mr. Smith's defense because Ms. Duncan's testimony should have been stricken for the Government's non-compliance Fed. R. Crim. P. 26.2, Ms. Duncan's credibility was central to Mr. Smith's defense, and Ms. Duncan's hearsay statements would have been inadmissible without her testimony.**

The Government's failure to produce Ms. Duncan's recorded statement in violation of Rule 26.2(e) requires that "the court must strike the witness's testimony from the record." *See generally United States v. McKoy*, 78 F.3d 446, 450-52 (9th Cir. 1996) (discussing sanctions for violation of Rule 26.2). Ms. Duncan was the Government's most important witness because she was the victim and only eyewitness to the alleged domestic incidents. Ms. Duncan's hearsay statements on the body camera footage were admissible against Mr. Smith because she was called as a witness and he was able to confront her. However, the Government's failure to produce Ms. Duncan's prior recorded statement on the 911 call mandates that her testimony be stricken. *See* Fed. R. Crim. P. 26.2(e).

If Ms. Duncan's testimony is stricken pursuant to Rule 26.2(e), the Government would not have been able to admit her hearsay statements on the body

55

camera footage or from the police officers who spoke to her because it could not show good cause for not producing her as a witness. *See United States v. Comito*, 177 F.3d 1166, 1170 (9th Cir. 1999) (citation omitted) ("[E]very releasee is guaranteed the right to confront and cross-examine adverse witnesses at a revocation hearing, unless the government shows good cause for not producing the witnesses."); *see also* Fed. R. Crim. P. 32.1(b)(2)(C) (requiring that a judge at a revocation hearing give the defendant "upon request, an opportunity to question any adverse witness unless the court determines that the interest of justice does not require the witness to appear.").

Ms. Duncan was clearly available, and she testified as a Government witness. The Government relied heavily on Ms. Duncan's hearsay statements on the body camera footage and to the responding police officers. But that testimony and body camera footage would be inadmissible under Comito if Ms. Duncan did not testify because the Government is unable to show good cause to admit the statements when Ms. Duncan was available and her testimony is stricken for its failure to produce her prior recorded statement. Thus, it is clear that Mr. Smith was prejudiced by the inclusion of Ms. Duncan's testimony, as her statements on the body camera were the most damaging evidence against him.

CONCLUSION

The Court should vacate Mr. Smith's sentence and remand to the district court because Mr. Smith's *Brady* rights were violated and Ms. Duncan's testimony was improperly admitted in violation of Rule 26.2. Specifically, if the Court holds that Mr. Smith's right to *Brady* evidence was violated, it should vacate Mr. Smith's sentence and remand for a new revocation hearing where the Government is ordered to produce *Brady* evidence. If the Court holds only that Mr. Smith's rights under Rule 26.2 were violated when Ms. Duncan's testimony was admitted in error, the Court should remand to the district court with instructions to strike Ms. Duncan's testimony and to rely only on her hearsay statements that were admitted in compliance with *Comito*.

Respectfully submitted,

Dated:  July 24, 2024          *Ryan W. Stitt*
                              RYAN W. STITT
                              Attorney for Defendant-Appellant
                              STITT VU TRIAL LAWYERS APC
                              Address: 185 W F St., Ste 100-K, San Diego, CA 92101
                              Email: rstitt@stittvu.com
                              Phone: (619) 255-0553

57

## CERTIFICATE OF RELATED CASES

Counsel is unaware of any related cases.

Respectfully submitted,


Dated:  July 24, 2024
*Ryan W. Stitt*
RYAN W. STITT
Attorney for Defendant-Appellant
STITT VU TRIAL LAWYERS APC
Address: 185 W F St., Ste 100-K, San Diego, CA 92101
Email: rstitt@stittvu.com
Phone: (619) 255-0553

58

CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number 24-471**

I am the attorney.

**This brief contains 13,561 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties;

[ ] a party or parties are filing a single brief in response to multiple briefs; or

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s Ryan W. Stitt _____     **Date** July 24, 2024

59